# MARGARET M. SHALLEY, ESQ.

MARGARET M. SHALLEY & ASSOCIATES, LLC
225 Broadway, Suite 715
New York, NY 10007
212-571-2670 (Phone)
212-566-8165 (Fax)
margaretshalley@aol.com

April 13, 2020

**VIA ECF & EMAIL**
The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re:     United States v. Beniquez
        18 Cr. 236 (KPF)

Dear Judge Failla:

I represent Armando Beniquez, the defendant in the above-referenced matter.  On April 2, 2020, counsel filed a letter motion requesting that the Court temporarily release Mr. Beniquez to home incarceration until the current COVID-19 pandemic has ended, pursuant to 18 U.S.C. § 3582(c)(1)(A), or until he is designated to the facility where he will serve the majority of his sentence.  On April 7, 2020, the Government filed a response, opposing the defendant's request.  This letter is submitted in reply to the Court's Order requesting further briefing on three issues related to the Court's authority to grant compassionate release.  Counsel respectfully requests that the Court temporarily release Mr. Beniquez to home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A), or that he be furloughed until the current COVID-19 pandemic has subsided in the prisons.

I.      The Court has the power to craft a new sentence pursuant to 18 U.S.C. § 3582(c)

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify or reduce a term of imprisonment "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf, or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier…" In order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), Mr. Beniquez must both meet the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a modification or reduction of his sentence.

1. <u>Exhaustion</u>

There is precedent to support the view that, even the mandatory statutory language in the First Step Act, requiring exhaustion of administrative remedies, allows for exceptions when any administrative relief under the statute would be futile, and the wait would cause undue prejudice, as it would undoubtedly do here. "Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146–47 (1992)). While the Government tries to cabin this decision to judicial-made exceptions to the exhaustion rule, the Second Circuit makes no such distinction. The Second Circuit notes that exhaustion is not required where (1) "exhaustion would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue," (2) the administrative process is not capable of granting the relief sought, or (3) pursuing agency review would subject the petition to "undue prejudice." *Id.* at 119.

All three of these exceptions apply here. Exhaustion is futile because the BOP has, to-date, not even acknowledged that it is considering the requests for compassionate released submitted by Mr. Beniquez through his counsel. Mr. Beniquez first filed a request for compassionate release on March 31, 2020, and again on April 2, 2020.[1] Mr. Beniquez has thus effectively been denied the ability to even begin the administrative process for compassionate release. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate. Finally, and obviously, [Mr. Beniquez] could be unduly prejudiced by such delay." *Washington*, 925 F.3d at 120–21; *see Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death"); *see also Perez*, 2020 WL 1546422, at \*2–3 (holding that § 3582(c)(1)(A)'s exhaustion requirement could be waived where delay carried the risk of the vulnerable defendant contracting COVID-19). Here, even a few weeks' delay carries the risk of catastrophic health consequences for Mr. Beniquez. Requiring Mr. Beniquez to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.

To be sure, "the policies favoring exhaustion are most strongly implicated" by challenges to the application of existing regulations to particular individuals. *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996) (internal quotation marks, citation, and alterations omitted). Ordinarily, requests for a sentence reduction under § 3582(c) would fall squarely

---

[1] Pursuant to 28 C.F.R. § 571.61, a request for compassionate release to the BOP can be made by another person on behalf of the inmate in the same manner as an inmate's request.

into that category. But "courts should be flexible in determining whether exhaustion should be excused," *id.* at 151, and "[t]he ultimate decision of whether to waive exhaustion . . . should also be guided by the policies underlying the exhaustion requirement." *Bowen*, 476 U.S. at 484. The provision allowing defendants to bring motions under § 3582(c) was added by the First Step Act, in order to "increas[e] the use and transparency of compassionate release." 132 Stat. 5239. Requiring exhaustion generally furthers that purpose, because the BOP is best situated to understand an inmate's health and circumstances relative to the rest of the prison population and identify "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A)(i). In Mr. Benquiez's case, however, administrative exhaustion would defeat, not further, the policies underlying § 3582(c).

Here, a number of factors weigh in favor of Mr. Beniquez's release. First, it is undisputed that Mr. Beniquez suffers from severe chronic asthma.[2] Moreover, Mr. Beniquez's risk of contracting a serious case of COVID-19 is heightened because of his environment. As numerous courts within and outside of this District have recognized, "[i]ndividuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases."[3] Additionally, public health experts and officials have warned, for at least the last decade, of the dangers of infectious disease outbreaks in institutional settings.[4] Prison conditions make controlling the spread of COVID-19 more challenging and the risk to vulnerable inmates, such as Mr. Beniquez, that much greater. *See United States v. Rodriguez*, 03 Cr. 271-1, 2020 WL 1627331, at *8 (E.D. Pa. Apr. 1, 2020) ("[P]risons are ill-equipped to prevent the spread of COVID-19 . . . the crowded conditions, in both

---

[2] PSR ¶ 61.

[3] *Coronel v. Decker*, No. 20-cv-2472 (AJN), 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) (emphasis added); accord *United States v. Davis*, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("The inability to practice social distancing in jails makes 'transmission of COVID-19 more likely.'"); *United States v. Harris*, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The risk of the spread of the virus in the jail is palpable . . . ."); *Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious."); *United States v. Ramos*, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[I]t is not possible for a medically vulnerable inmate . . . to isolate himself in [an] institutional setting as recommended by the CDC . . . .").

[4] See, e.g., Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047 (Oct. 2007), https://doi.org/10.1086/521910 (noting that in jails and prisons "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); Claudia Lauer & Colleen Long, *US Prisons, Jails on Alert for Spread of Coronavirus*, Associated Press (Mar. 7, 2020), https://apnews.com/af98b0a38aaabedbcb059092d b356697 ("Health officials have been warning for more than a decade about the dangers of outbreaks in jails and prisons, which are ideal environments for virus outbreaks: Inmates share small cells with total strangers, use toilets just a few feet from their beds, and are herded into day rooms where they spend hours at a time together."); Letter, Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States (March 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid19_letter_from_public_h ealth_and_legal_experts.pdf ("Special attention must be paid to the needs of people in . . . confinement, who are particularly vulnerable. People . . . who are incarcerated . . . are at special risk of infection, given their living situations. These individuals may also be less able to participate in proactive measures to keep themselves safe, and infection control is challenging in these settings. Arrest and short-term incarceration can help amplify epidemics . . . .").

sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) . . . facilitate transmission." (citation omitted)).

Finally, application of the exhaustion doctrine is "intensely practical" and must be "guided by the policies underlying the exhaustion requirement." *Id*. at 484. In this case, the FSA protects defendants by providing them with both a presumed orderly administrative process and a 30-day period after which they can bring a claim if that process takes too long. The FSA was also expanded to allow prisoners to bring their own motions in recognition of the fact that the BOP had previously failed to act in using the compassionate release remedy. Since the administrative remedy prong of the FSA is effectively unavailable during this crisis, the 30-day waiting period does not serve any purpose. At the end of the day, even if the BOP were to file a compassionate release motion, the Court would have to consider the merits and decide whether to reduce Mr. Beniquez's sentence. Waiver of exhaustion would therefore serve the underlying purpose of the exhaustion requirement in the FSA by expediting the Court's consideration of the matter in the face of agency inaction.

In *United States v. Zuckerman,* No. 16 Cr. 194 (AT) (S.D.N.Y. April 3, 2020), Judge Torres concluded that requiring the defendant to exhaust administrative remedies, given his circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate. Judge Torres held that the defendant's compromised health and age, combined with the high risk of contracting COVID-19 while incarcerated, justified the waiver of the exhaustion requirement. In so holding, Judge Torres noted that a number of courts have denied applications for sentence modifications under § 3582 brought on the basis of the risk posed by COVID-19 on the ground that the defendant failed to exhaust administrative remedies. However, in several of those cases, the defendant was not in a facility where COVID-19 was spreading and the defendants did not present compelling evidence that their medical condition put them at particular risk. In this case, Mr. Beniquez is housed in a facility with confirmed cases of COVID-19, and his cellmate exhibited symptoms of the virus, although it is unclear if Mr. Beniquez's cellmate was tested. Additionally, COVID-19 is known to cause respiratory issues because it affects the respiratory tract.[5] Mr. Beniquez's severe asthma places him at an increased risk for a severe case of COVID-19.

2. Extraordinary and Compelling Reasons for Release

Mr. Beniquez has also set forth "extraordinary and compelling reasons" to modify his sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), because of the great risk that COVID-19 poses to him as a result of his underlying health problems. The authority to define "extraordinary and compelling reasons" has been granted to the United States Sentencing Commission, which has defined that term at U.S.S.G. § 1B1.13, comment n.1. *See United States v. Ebbers*, No. 02 Cr. 11443, 2020 WL 91399, at *4–5 (S.D.N.Y. Jan. 8, 2020). Two components of the definition are relevant. First, extraordinary and compelling

---

[5] *What Does Coronavirus Do To Your Body?*, WebMD, https://www.webmd.com/lung/coronavirus-covid-19-affects-body#1.

reasons for modification exist where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 comment n.1(A)(ii).

Mr. Beniquez's underlying severe chronic asthma satisfies this requirement. According to the World Health Organization, the populations most at risk of suffering a severe form of the disease include "older people, and those with underlying medical problems…" Coronavirus, World Health Organization (Mar. 23, 2020), https://www.who.int/healthtopics/coronavirus#tab=tab_1. The Government argues that Mr. Beniquez's severe chronic asthma and the risks that COVID-19 presents to someone with an underlying respiratory illness are not extraordinary or compelling reasons for compassionate release. [6] Further, the Government states that the BOP is prepared to handle the risks presented by COVID-19 and that the BOP has made significant efforts to mitigate the spread of the illness, because only 4 of 700 inmates have tested positive. However, what this argument fails to address is the BOP's inability to test inmates. There is good reason to believe that the MCC is not sufficiently protecting inmates from each other and staff who are highly contagious. In a report to Chief Judge Mauskopf on April 7, 2020, the BOP noted that only 5 inmates have been tested for the virus and that if an inmate exhibits symptoms, they are "assessed by the institution health services staff." M. Licon-Vitale, MCC Warden and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14*, Federal Bureau of Prisons (Apr. 3, 2020), *at* https://img.nyed.uscourts.gov/files/reports/bop/20200403_BOP_Report.pdf. Without testing, it is impossible to identify infected inmates, effectively isolate them, and quarantine those with whom they had contact, resulting in increasing spread, and in some cases, death. In comparison, in New York state-run facilities in the region, there are 286 tested-positive inmates on Rikers Island,[7] where testing is more robust; likewise, at Westchester County Jail, 24 inmates and 60 staff have tested positive and an additional 73 symptomatic people have taken tests and are awaiting results.[8] Across the BOP, even with frighteningly low levels of testing, tested-positive cases have risen 12800% since March 20, 2020, from 2 confirmed cases among inmates and staff to 258.[9] Eight federal inmates have already died from COVID-19.[10] The 12800% rate of increase inside BOP facilities vastly outpaces the 1845% rate of increase across the United States, even with abysmally low testing.[11]

[6] The Government, in *United States v. Villanueva*, No. 18 Cr. 472 (KPF) (S.D.N.Y. April 6, 2020), conceded that the defendant's history of asthma places him at a higher risk for severe illness resulting from COVID-19, according to guidance provided by the Centers for Disease Control and Prevention.
[7] *Coronavirus Infection Rates as of April 3, 2020*, The Legal Aid Society (Apr. 6, 2020), *at* https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.
[8] *United States v. Willie Sims*, 19-CR-857 (NSR) (S.D.N.Y.) (letter filed by the Government Apr. 5, 2020).
[9] *COVID-19 Tested Positive Cases*, Federal Bureau of Prisons (Apr. 6, 2020), at https://www.bop.gov/coronavirus/index.jsp.
[10] *Press Releases*, Federal Bureau of Prisons (Apr. 6, 2020), *at* https://www.bop.gov/resources/press_releases.jsp.
[11] *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University (Apr. 7, 2020), *at* https://bit.ly/39PMV4c.

The Government provided counsel with Mr. Beniquez's medical records from the prison. These medical records stop at March 26, 2020. COVID-19 has a 14-day incubation period and a person many not experience symptoms after having contracted the virus for over two weeks. Further, the Government does not deny that Mr. Beniquez's roommate was sick with a 103-degree fever and was removed from the cell. On March 26, 2020, Mr. Beniquez tested with a 99-degree temperature and was sent back to his cell. However, symptoms can escalate quickly and the BOP is not equipped to respond in a timely manner to an inmate who contracts COVID-19 and also has severe underlying respiratory problems. According to Mr. Beniquez, on March 30, 2020, he had chest pains but was not seen by a doctor.[12] Mr. Beniquez currently does not have an asthma inhaler despite repeatedly requesting one.

This Court and others have held that compassionate release is justified under such conditions. *Perez*, 2020 WL 1546422, at *4; *see Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (finding "extraordinary and compelling reasons justifying . . . immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13" where defendant has "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19" (internal quotation marks, citation, and alteration omitted)); *United States v. Muniz*, 09 Cr. 199, 2020 WL 1540325, at *2 (finding extraordinary and compelling circumstances because "[d]efendant has been diagnosed with serious medical conditions that, according to reports from the Center[s] for Disease Control, make him particularly vulnerable to severe illness from COVID-19 . . . includ[ing] inter alia, end stage renal disease, diabetes, and arterial hypertension."); *United States v. Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (approving compassionate release for defendant where his "compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care"); *United States v. Sawicz*, No. 08 Cr. 287 (ARR) (waiving the exhaustion requirement and granting defendant's motion for compassionate release finding extraordinary and

---

[12] On April 10, counsel received the following text message from Mr. Beniquez: "hello ms. shalley its Armando, they let us out for an hour just now at 9:00 am and the phones are not working. [I] tried contacting you and [I] will continue to try to contact you. [I] still haven't received proper medical attention[.]] [Y]esterday 4/9/2020 I felt short breathing and [I] told officer "d.ortiz" to try to get me a asthma pump at 9:55pm they came back around for count at 12:00am [I] couldnt sleep because of my asthma acting up and [I] asked" d.ortiz and his partner if they called medical and they said medical never got back to them. [I] ended up going to sleep around 3:30 am because it was hard for me to sleep in those conditions. [S]ame officer was on the floor this morning 4/10/2020 and [I] asked what happen, they said they called medical twice and no reply but he a witness. [I] had to use someone else's inhaler and that wasn't sanitary at all but my chest was really tigh[ten]ing up. [The] computer only gives me 20 minutes [I] will also try to write the warden t[h]rough the computer but they about to lock us in. [W]e locked down 23 hrs a day most of the times 24 hrs. [I] haven't been able to take a proper shower for about 10 days counting since they took [my cellmate] the 31st. [I]ts hard to shower, clean up, get on a line to call everyone and to make another line to write my parents, the warden, you guys its nearly impossible. [A]nd [I] haven't been feeling good...[I] will try to ask if [I] can make a legal call."

compelling circumstances because of defendant's hypertension, which places him at risk of suffering severe complications if he were to contract COVID-19).

Further, under 18 U.S.C. § 3624(c)(2), a prisoner may be placed "in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(2). However, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") expanded the maximum amount of time that a prisoner may spend in home confinement: "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement . . . ." CARES Act § 12003(b), Pub. L. No. 116-136, 134 Stat. 281 (2020). Attorney General William Barr made the requisite "finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons" on April 3, 2020, thereby triggering the BOP's authority to expand the amount of time that a prisoner may spend in home confinement. Mem. for Director of BOP, (Apr. 3, 2020).

The Court may fashion a new sentence by reducing the term of imprisonment by one day and imposing a term of home confinement to be followed by a term of imprisonment when the virus subsides or when Mr. Beniquez is designated.

## II.    Pursuant to 18 U.S.C. § 3622, a temporary release, or "furlough", can exceed thirty (30) days in duration or be renewed or extended

Pursuant to Title 18 Section 3622, a furlough may exceed 30 days in duration and be renewed or extended. Section 3622 authorizes the Bureau of Prisons to furlough inmates "in the public interest" up to 30 days to visit "a designated place" "for the purpose of" either "obtaining medical treatment not otherwise available" and "engaging in any other significant activity consistent with the public interest." Both purposes are satisfied here. According to the BOP's regulations regarding furlough, 28 C.F.R. § 570.30 et. al, Mr. Beniquez qualifies as an inmate eligible for furloughs. *Id.* at § 570.31(a)(1). Mr. Beniquez is a sentenced inmate housed in a Bureau facility. *Id.* The BOP regulations also allow for multiple furloughs. Generally, an inmate must re-apply for a furlough every 30 days. However, Subsection 12 of § 570.37 provides that "when multiple furloughs are necessary over an extended period or on a recurring basis… the Warden may forward an exemption request to the Regional Director. If approved, staff complete one furlough application, which expires when the activity concludes or on the one-year date of the initial furlough."

## III.    The Court can judicially review a decision by the BOP pursuant to Section 3622

A decision by the BOP denying such relief is judicially reviewable. *See, e.g., Santos v. United States*, No. 12 Civ. 4836 (DLI), 2013 WL 1952509, at *1 (E.D.N.Y. May 10, 2013); *Zucker v. Menifee*, No. 03 Civ. 10077 (RJH), 2004 WL 102779, at *11 (S.D.N.Y. Jan. 21, 2004). Section 2241(c)(3) authorizes courts to grant habeas corpus relief where a person is "in custody in violation of the Constitution or laws or treaties of the United States." The Second Circuit has "long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as . . . prison

conditions." *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (internal quotation marks omitted). This includes challenges to detention where conditions pose a threat to an inmate's medical wellbeing. *See, Roba v. United States*, 604 F.2d 215, 218-19 (2d Cir. 1979) (approving the use of Section 2241 to challenge a detainee's transfer where that transfer created a risk of fatal heart failure).

The Second Circuit's decision in *Roba* is instructive. In that case, the petitioner alleged that an imminent transfer from New York to face charges in California would create a substantial risk of death because of his precarious heart condition. The Second Circuit held that there was Section 2241 jurisdiction to challenge his contemplated transfer, where such custody would threaten his life, citing *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court's seminal case establishing the Eighth Amendment's deliberate indifference standard. *Id*. Critically, the court held that habeas jurisdiction was appropriate even though the transfer, and hence custody, was imminent, stating, "Petitioner need not wait until the marshals physically lay hands on him; he is entitled now to challenge the allegedly unlawful conditions of his imminent custody." *Id*. at 219.

In this case, the unconstitutional threat to Mr. Beniquez's health and life posed by being held at the MCC is ongoing, not simply imminent. Every hour that he is held in the MCC places him at a significantly elevated risk of contracting coronavirus, and dying from the disease. The MCC's deliberate indifference to his asthma is evidenced by the fact that he has been requesting an inhaler from at least March 30, 2020, until April 10, 2020, because of tightness in his chest and still has not received a pump nor seen medical personnel. For similar reasons, Judge Analisa Torres recently ordered the release of several individuals from federal immigration detention. *See Basank*, 2020 WL 1481503; *see also Coronel, et al., v. Decker et al*., 20 Civ. 2472 (AJN) (S.D.N.Y. Mar. 27, 2020) (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); *Arana v. Barr et al*., 19 Civ. 7924 (PGG)(DCF) (S.D.N.Y. Mar. 27, 2020) (recommending "that, due to extraordinary circumstances brought about by the COVID-19 outbreak, which has apparently reached the jail where Petitioner is being detained, and by which he may be particularly seriously impacted as a result of underlying medical conditions, Petitioner be ordered released from [immigration] custody pending his bond hearing"); *U.S.A. v. Barkman*, 19 Cr. 52 (D. Nev. Mar. 17, 2020) (suspending requirement that defendant report to prison to serve intermittent confinement due to risks associated with COVID-19).

That said, nothing in Section 3622 prevents this Court from recommending that the BOP exercise its discretion to grant Mr. Beniquez temporary release. "Realistically, the best — perhaps the only — way to mitigate the damage and reduce the death toll [of inmates from COVID-19] is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, 18-CR-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020). COVID-19 poses a particularly grave danger to people with respiratory issues, such as asthma. Thus, for Mr. Beniquez, contracting COVID-19 might change his 24-month sentence into a death sentence. Notably, that view accords with the Attorney General's direction to "immediately review *all inmates* who have COVID-19 risk

factors" to identify "suitable candidates for home confinement." Memorandum from Att'y Gen. William Barr to Dir. of the Bureau of Prisons, at 2 (Apr. 3, 2020) (emphasis added).

The Court has the power under 28 U.S.C § 1651, the All Writs Act, to issue a writ in the nature of mandamus compelling the warden to act promptly and in good faith to consider a request from Mr. Beniquez for a furlough. If the BOP denies the application for a furlough or refuses to act without delay, the Court has the authority to grant a writ of habeus corpus pursuant to 28 U.S.C. §§ 2243 and 1361. Additionally, under the All Writs Act, the Court has the power to temporarily release Mr. Beniquez to home confinement. The Act provides that: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." As noted by the Government in their response to the Court's Order, the All Writs Act is a "residual source of authority to issue writs that are not otherwise covered by statute," such that "[w]here a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Penn. Bureau of Corrs. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977)). In the absence of exceptional circumstances that clearly show the inadequacy of the statutory procedure, the All Writs Act "does not authorize" courts to "issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Id.* at 43. However, in this case, there is no statute that specifically addresses the particular issue at hand. Specifically, Congress has not specifically or clearly stated that courts cannot step in and grant indefinite stays of imprisonment due to significant threats to an inmate's health. Additionally, exceptional circumstances exist that clearly show the inadequacy of the compassionate release statute, as well as the procedures involved in requesting a furlough. COVID-19 is extremely contagious and as a result, spreads at a rapid pace, as evidenced by the number of cases reported daily. The statutory procedure for compassionate release does not adequately take into account a national pandemic and the need to timely release an inmate who is at a heightened risk for a severe case of COVID-19. If a national pandemic that has essentially shut down the nation is not an exceptional circumstance, what is?

Temporarily furloughing Mr. Beniquez to home incarceration will potentially save his life while not compromising the asserted interest of the United States in seeing that he serves the term of imprisonment imposed by the Court. Mr. Beniquez will remain confined to his home under conditions of home incarceration. However, he will report to his designated institution for the remainder of his sentence when it is appropriate and safe to do so. Lastly, Mr. Beniquez is currently housed at the MCC, located in New York, New York. His petition to this Court was filed in the federal district of confinement.

## Conclusion

Given the unprecedented and extraordinarily dangerous situation COVID-19 presents, I move this Court to modify Mr. Beniquez's sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement with electronic monitoring until the current health pandemic has subsided in the prisons. If the Court does finds that it currently

does not have the power to grant compassionate release, counsel respectfully requests, in the alternative, that the Court proceed in the same fashion as Judge Nathan in *United States v. Gross*, 15 Cr. 769 (AJN) (S.D.N.Y. April 6, 2020), and request that the BOP make a final determination on Mr. Beniquez's request for compassionate release in a timely manner or one week, or recommend that the BOP consider whether to grant Mr. Beniquez a temporary release pursuant to the furlough statute, as Judge Furman did in *United States v. Roberts*, 18 Cr. 528 (JMF) (S.D.N.Y April 8, 2020), because doing so would reduce the threat posed to him and to all inmates detained in the MCC, while also ensuring that he serves the sentence that the Court concluded he deserves.

The Court's time and consideration of this request are greatly appreciated.

Respectfully submitted,

/  s  /

Margaret M. Shalley

cc:     AUSA Ryan Finkel (*via ECF and email*)